## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES E. SCALES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-0553 |
| | ) | JUDGE ECHOLS |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON COUNTY, | ) | |
| TENNESSEE, | ) | |
| | ) | |
| Defendant. | | |

### MEMORANDUM

Presently pending before the Court is Defendant's Motion for Summary Judgment (Docket Entry No. 10), to which Plaintiff has responded in opposition and Defendant has filed a reply. In the Complaint, Plaintiff James E. Scales ("Plaintiff") alleged against Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Defendant") two counts of retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and one count of breach of employment contract under 42 U.S.C. § 1983 and Tennessee state law. Defendant now moves for summary judgment in its favor on all claims.

### I.   FACTS

Plaintiff began his employment with the Metropolitan Police Department on March 16, 1992. The Police Department assigned Plaintiff to the warrants division in 1994 or 1995 after abolishing the walking detail to which he was previously assigned. Plaintiff has not at any time applied for a position outside the warrants division. Through the years, Plaintiff attained the status of

1

Police Officer II and received all of his annual pay raises, plus an additional six percent (6%) educational bonus.[1]  At the time the summary judgment motion was briefed, Plaintiff was earning an annual salary of $54,334.54, and he was eligible for the annual pay raise increment effective July 2006.[2]

On May 27, 1999, Plaintiff and Defendant settled a racial discrimination and retaliation lawsuit Plaintiff had filed in this Court.  Scales v. Metropolitan Government of Nashville-Davidson County, No. 3:98-0357 (M.D. Tenn.).  Among other terms, Defendant agreed "that it will not retaliate and/or discriminate against James E. Scales regarding job assignments, promotions, salary, or other conditions of his employment as a result of his filing this complaint."  (Docket Entry No. 10-1, Ex. A, Depo. Ex. 21 ¶ 6.) Plaintiff requested that copies of the settlement agreement be placed in all of his police department files.  The settlement agreement did not prohibit Defendant from disciplining Plaintiff for improper conduct or from giving him specific job assignments, nor did it prohibit Defendant from requiring Plaintiff to abide by the lawful General Orders of the Police Department.  Based on his annual performance evaluation scores, in the years July 1, 2001 through July 1, 2005, Plaintiff received his annual pay increases.

_____

[1]Plaintiff has a college degree in Criminal Justice and Aerospace Technology, and is pursuing a doctorate in Sociology-Criminology.  (Docket Entry No. 1 ¶ 5.)

[2]Defendant terminated Plaintiff's employment on May 5, 2006. At present Plaintiff has not sought leave to amend the Complaint to add any allegations concerning the circumstances of his termination.

2

All commissioned officers who work in the warrants division are responsible for transporting prisoners and mental health patients, including Lieutenant Robert Tindall, who joined the warrants division in early 2000. Warrant division officers retrieve or arrest individuals from secure and non-secure facilities, such as probation offices, but there are no written policies governing how many officers are assigned to handle a particular task. Officers are allowed to conduct transports from non-secure facilities alone, but they may use their police radio to call for assistance if necessary. Prior to February 2005, a warrants division officer could travel alone up to thirty-five miles outside of Davidson County to retrieve a prisoner from a secured facility. If the distance was more than thirty-five miles, policy required that two officers make the trip. (Docket Entry No. 10-2, Tindall Depo. at 20.) Policy then changed to add fifteen miles to the pick-up radius so that one officer can travel alone fifty miles. The officer may check out a cell phone to take along to call for assistance if needed. (Id. at 20-21.)

According to Lt. Tindall, where a dangerous felon is concerned, i.e., involving murder, armed robbery or aggravated assault, policy dictates that two officers retrieve the prisoner. However, the number of officers used in any situation depends on the circumstances. For instance, one officer may be sufficient to pick up an individual who is on probation for aggravated assault if he is not currently violent. ( Id. at 23.) Plaintiff produces evidence, however, that every shift is different, and when a

3

potentially violent prisoner must be picked up, the warrants division calls the patrol division because they will send two officers. (Docket Entry No. 24, Davenport Depo. at 8.) Usually one officer can handle transporting a prisoner from the warrants division to the booking room approximately fifteen feet away, but if an officer feels he needs help moving the prisoner, he can ask for assistance. (Tindall Depo. at 21-22.) In five years Plaintiff reported two incidents in which he was slightly injured or had to use force to transport or arrest someone.

The parties agree that Lt. Tindall did not hinder Plaintiff's attempts to lodge a complaint with the Office of Professional Accountability ("OPA") in 2001. In March 2001, the OPA investigated Plaintiff's complaints about the alleged disappearance of documents related to his appeal of his promotional test score, failure by former Chief of Police Emmett Turner to address his grievances and retaliation by the Police Department. At the conclusion of the year-long investigation, no evidence was discovered to support the allegations. Ronal Serpas has been the Chief of Police since 2004. He has not had any personal conversations with Plaintiff about his 1998 lawsuit against Defendant or any of his subsequent allegations against the Police Department.

Plaintiff attests that, after his lawsuit was settled, he returned to his duties as a police officer in the warrants division, and was placed under the supervision of Lt. Tindall. (Docket Entry No. 23, Scales Aff. ¶ 4.) As a result of Lt.

4

Tindall's actions, Plaintiff avers he was forced on many occasions to handle booking assignments that were dangerous due to lack of backup. He voiced his concerns on many occasions to Lt. Tindall. (Id.)

On April 28, 2002, Lt. Tindall suspended Plaintiff for one day for following the order of a senior officer, James Johnson, regarding the service of an order of protection. Officer Johnson admitted his guilt in the incident, but was not reprimanded by Lt. Tindall. Plaintiff asked Lt. Tindall about the disparity. He responded, "You can blame that mickey mouse lawsuit and stupid retaliation claim for this day you're getting." (Id. ¶ 5.)

On July 15, 2002, Lt. Tindall ordered other officers not to assist Plaintiff in a potentially life-threatening situation at the Day Reporting Center. (Id. ¶ 6.) On January 30, 2003, Lt. Tindall instructed Sgt. Forest Henderson to assign Plaintiff to a potentially dangerous assignment at Centennial Medical Center, without assistance. According to Plaintiff, this was against departmental policy. (Id. ¶ 7.)

On March 3, 2003, Lt. Tindall contacted patrol supervisors in an effort to not allow backup in the transportation of a murder suspect from Vanderbilt University Medical Center. (Id. ¶ 8.) On August 19, 2003, Lt. Tindall instructed Sgt. Henderson to assign Plaintiff to a potentially dangerous assignment to transport a mental patient from the Mobile Life Family Life Center to Middle Tennessee Mental Health Center ("MTMHI"), without assistance. (Id. ¶ 9.) On August 20, 2003, Lt. Tindall instructed Sgt. Henderson to assign Plaintiff to a potentially dangerous assignment involving a

5

mental patient at Centennial Medical Center, without assistance. According to Plaintiff, this was in violation of departmental policy. (Id. ¶ 10.)

On or about October 7, 2003, Lt. Tindall again instructed Sgt. Henderson to assign Plaintiff to transport a potentially dangerous patient from Elam Mental Center to MTMHI, without assistance. The same day, Lt. Tindall assigned Plaintiff to book a defendant charged with murder and aggravated child abuse, without assistance. According to Plaintiff, this was in violation of departmental policy. (Id. ¶¶ 11-12.)

On October 8, 2003, Lt. Tindall assigned Plaintiff booking-room responsibilities for a dangerous suspect charged with aggravated assault, without backup. On October 13, 2003, Lt. Tindall instructed a supervisor to assign Plaintiff to transport a potentially danagerous juvenile patient from Tennessee Christian Medical Center to MTMHI, without assistance. On or about November 10, 2003, Lt. Tindall assigned Plaintiff the booking process of a potentially dangerous defendant charged with burglary, without assistance. (Id. ¶¶ 13-15.)

Plaintiff attests that, on January 7, 2004, two other Metro booking room employees, Jamie Thompson and Donya Davenport, told Plaintiff that he had been placed in the "Enemy's Camp" by Lt. Tindall and another officer, Doug Anderson. ( Id. ¶ 16.) On January 14, 2004, Lt. Tindall ordered Plaintiff, without assistance, to arrest, handcuff, escort and book a suspect charged with aggravated assault who had previously demonstrated violent tendencies. When Plaintiff raised concerns about the assignment,

6

Lt. Tindall told Plaintiff to "keep your mouth shut or I will have your badge." As Plaintiff was booking the prisoner, Plaintiff asked Lt. Tindall why he would talk to him that way. Lt. Tindall responded, "You should have resigned after suing Metro." He also stated that "you will regret the decision to stay." According to Plaintiff, this action violated departmental policy requiring the assignment of two officers. (Id. ¶¶ 17-18.)

After the incident, Plaintiff asked Lt. Tindall about the "Enemy's Camp" comment. Lt. Tindall did not deny making the statement and said, "If the shoe fits. . . ." Plaintiff expressed concern about the statement. Lt. Tindall threatened Plaintiff with disciplinary action for insubordination if he continued to press the issue. (Id. ¶ 19.)

On January 26, 2004, Lt. Tindall ordered Plaintiff to perform another potentially dangerous transport, this time a patient at the Mental Health Co-op Center. When Plaintiff raised concern about the lack of back-up, Lt. Tindall ordered Plaintiff to perform the assignment anyway. Plaintiff again asked Lt. Tindall about his "Enemy's Camp" comment. Lt. Tindall replied, "I didn't place you in the Enemy's Camp; you placed yourself in the Enemy's Camp." He further stated that if Plaintiff wanted to get out of the "Enemy's Camp," he needed to resign from the Police Department. (Id. ¶¶ 20-21.)

On February 9, 2004, Lt. Tindall ordered Plaintiff to perform another potentially dangerous assignment concerning a mental patient at Tennessee Christian Medical Center. Plaintiff

7

complained to Lt. Tindall about the lack of backup. Lt. Tindall stated, "There are consequences for suing Metro, feel what I am talking about?" (<u>Id.</u> ¶ 22.)

On February 15, 2004, Plaintiff mailed a letter to Chief Serpas stating his concerns about Lt. Tindall and the retaliation he believed was occurring in the warrants division. Plaintiff did not receive a response from Chief Serpas. (<u>Id.</u> ¶ 23 & Collective Ex. A.) On February 17, 2004, Plaintiff told Lt. Tindall he had written a letter to Chief Serpas about his actions and disregard for policies and procedures. Lt. Tindall shouted at Plaintiff and called him a "piss-ant" and "troublemaker." Lt. Tindall then issued Plaintiff an MPD Form 312 (counseling statement) for "bothering him." Lt. Tindall refused to provide Plaintiff with a copy of the form. (<u>Id.</u> ¶ 24.)

On March 2, 2004, Plaintiff submitted a grievance to Lt. Tindall about the incident on February 9 and counseling statement on February 17. Lt. Tindall wadded up the grievance and tossed it at Plaintiff, who tried to pick it up off the floor, but Lt. Tindall told Plaintiff to leave it on the floor. Plaintiff later saw Lt. Tindall pick it up and throw it in the wastebasket. (<u>Id.</u> ¶ 25.) On March 21, 2004, Plaintiff asked Lt. Tindall about the grievance. Lt. Tindall told him to "shut up and report to your duty station." (<u>Id.</u> ¶ 26.) Also on March 21, Plaintiff heard Lt. Tindall and Officer Paul Sharpe discussing Sharpe's request to transfer from the warrants division. Apparently, Sharpe was considering whether to approach Assistant Chief Bishop about the

8

request.  Bishop is an African American.  Plaintiff heard Lt. Tindall tell Sharpe that Bishop was just a "token black jellybean."  Plaintiff told Lt. Tindall that he was offended by the comment and would report it.  Sharpe then stated, "Report what, I didn't hear nothing."  (Id. ¶ 27.)

On March 24, 2004, Plaintiff overheard Lt. Tindall in the booking room on the phone.  Plaintiff heard him say, "Chief Serpas told his department heads in a staff meeting to get rid of the old guys and troublemakers.  F--k the old guys, I'm working on ridding one special-ass troublemaker in here."  (Id. ¶ 28.)  Plaintiff went in Lt. Tindall's office and asked him about the status of his grievance.  Lt. Tindall told him to "forget about receiving a reply because you ain't getting one."  (Id. ¶ 29.)

On April 6, 2004, Plaintiff wrote Lt. Tindall a letter about the actions he perceived to be retaliation and harassment based on the prior lawsuit against Metro.  (Id. ¶ 30, Collective Ex. B.) Lt. Tindall took the letter and put it in the paper shredder. Plaintiff then wrote three more letters dated May 26, 2004, June 1, 2004, and June 30, 2004.  He stated his concerns about dangerous assignments, disparate treatment, theft of his personal information, Lt. Tindall's fostering of animosity between Plaintiff and employees in the booking room, and Lt. Tindall's failure to submit Plaintiff's grievance for review.  In the June 30 letter Plaintiff stated he intended to go to the EEOC if Lt. Tindall continued to ignore his concerns.[3]  (Id. ¶¶ 30-31.)

---

[3]Defendant states Lt. Tindall was directed to forward the complaint letters to his supervisors because of confusion Plaintiff

On April 26, April 27, and May 11, 2004, Plaintiff verbally complained to Lt. Tindall about booking room assignments, and on each occasion, Lt. Tindall ignored the complaint and ordered Plaintiff to complete the assignment. (Id. ¶ 32.) On May 17, 2004, Plaintiff asked Lt. Tindall why he allowed another Metro employee, Nicholas Pride, to remove, and in some cases destroy, project worksheets from Plaintiff's mailbox, all without corrective action. Lt. Tindall told Plaintiff to "deal with it." Id. ¶ 33.)

On May 25, 2004, Plaintiff asked Lt. Tindall why he allowed another employee, Officer Sharpe, to dump trash on his desk without any corrective action. Lt. Tindall replied, "If you can't stand the heat, get out of the kitchen." (Id. ¶ 34.) On June 1, 2004, Lt. Tindall told Plaintiff that he was going to seek a reassignment for him and also attempt to obtain his badge. ( Id. ¶ 35.) On June 21, 2004, Plaintiff complained to Lt. Tindall about the continued spreading of rumors in the booking room about a medical condition Plaintiff was alleged to have. Lt. Tindall told him that "when you buck the bull, you get the horn." ( Id. ¶ 36.) On June 22 and 28, 2004, Plaintiff continued to raise concerns about booking room assignments relating to the transport of dangerous felons without backup. Lt. Tindall ignored the concerns and ordered Plaintiff to carry out the assignments. (Id. ¶ 37.) As a result of the retaliation and harassment from Lt. Tindall, Plaintiff began to experience health problems and took several days

---

created about which persons he intended to receive copies of the letters.

off work due to severe stomach pains, headaches, and nausea. A doctor told Plaintiff his condition was due to stress. (Id. ¶ 38.)

On June 30, 2004, Plaintiff gave Lt. Tindall a letter about the continued avoidance of his grievance, stating he felt the avoidance and denial of his complaint was in violation of departmental policy and federal law based on retaliation under Title VII. Lt. Tindall told him that he was not worried and that Plaintiff's "goose is cooked anyway, it's just a matter of time." (Id. ¶ 39.)

On July 21, 2004, Plaintiff wrote a letter to Lt. Tindall and also named Captain Carl Roller, Deputy Chief Steve Anderson and Chief Serpas. He delivered the letter to Lt. Tindall and Capt. Roller. (Id. Ex. C.) Lt. Tindall submitted his copy of the letter to Capt. Roller. As a result of the letter, Lt. Tindall told Plaintiff that "getting transferred or fired from this job is the last thing you'll have to worry about, you've got bigger problems, son." (Id. ¶ 41.)

On July 26, 2004, Plaintiff mailed a letter to Chief Serpas again requesting that he respond to the complaints of retaliation and harassment. (Id. Ex. D.) On July 27, 2004, Plaintiff was decommissioned as a police officer by Deputy Chief Anderson, which was approved by Chief Serpas. Plaintiff avers he was not told the reason for his decommissioning. (Id. ¶¶ 42-43.) Plaintiff was decommissioned because of an allegation that he used his police power to arrange for the dismissal of a DUI charge in exchange for a vehicle. A private citizen named Angela Warfield approached

11

Lt. Tindall complaining of domestic problems she was having with Plaintiff. Warfield alleged that Plaintiff had improperly accepted a vehicle. There is evidence in the record that Warfield's credibility was questionable and that she may have recanted her story.[4]

As a result of the decommissioning, Plaintiff was transferred from the warrants division to a desk job at another precinct where he performed menial, administrative tasks and duties. Plaintiff considered it a demotion. His gun and badge were taken away and he was no longer allowed to obtain other employment, such as security jobs, as a uniformed Metro police officer to earn additional income. (Id. ¶ 45.) Plaintiff lost shift differential pay amounting to about $1,200 per year, which he had received for the previous four years.

Plaintiff asserts the Police Department's actions violated General Order No. 98-8. (Id. ¶ 44, Ex. E.) The Order states in part:

---

[4]This was not the first time Plaintiff had been disciplined. In June 1992, while still a student at the Police Department training academy, Plaintiff was suspended for three days without pay after pleading guilty to violating the police department's policies on truthfulness and false or inaccurate reports. In July 1992, while still an academy student, Plaintiff received a written reprimand after pleading guilty to violating the Police Department's attendance policy. In July 1994 Plaintiff was suspended for six days without pay after pleading guilty to violating various Police Department general orders. In September 1994 Plaintiff was suspended for three days without pay. Plaintiff was suspended for one day from vacation in 2002, in lieu of a disciplinary hearing or civil service appeal, for failing to confirm an order of protection after pleading guilty to the offense. Plaintiff did not appeal any of the disciplinary actions taken against him to the Metropolitan Civil Service Commission.

12

VI.  COMPLAINT PROCEDURES

The department employee taking the complaint shall
promptly submit a confidential memorandum, documenting
the complaint, to the Chief of Police, with a copy
forwarded to the complaining party's Bureau Commander and
Internal Security Division.

VII.  RETALIATION

Monitoring to ensure that retaliation does not occur is
the responsibility of the Chief of Police, all
supervisors and the Internal Security Division.

On August 25, 2004, Plaintiff requested a charge letter from
the Police Department pursuant to departmental policy.  He received
no reply.  In addition, the investigation was to be completed
within forty-five days, but it was not.[5]  Plaintiff also asserts
that two departmental policies concerning notice and keeping
Plaintiff informed of the progress of the investigation were
violated.  (Id. ¶ 48.)  Plaintiff asserts he was not brought up on
formal charges as a result of the allegations Chief Serpas and
Deputy Chief Anderson made to achieve his decommissioning.  (Id.
¶ 49.)

Decommissions are governed by Defendant's General Order 01-14.
Pursuant to that General Order, the Chief of Police may
decommission a departmental employee until the circumstances giving
rise to the decommissioning have been resolved.  A decommissioned
officer may be reassigned to other duties pending the resolution of
an investigation, litigation or other related problems, just as
police officers who are not decommissioned are subject to shift

---

[5]Defendant produces evidence contradictory to many of
Plaintiff's allegations.  (Docket Entry No. 12, Ex. E, Sawyers Aff;
Docket Entry No. 13, Ex. F, Anderson Aff.; Docket Entry No. 14,
Camacho Aff.)

changes or changes in their work assignments. It is not unusual for a decommissioned officer to be reassigned to another precinct.

While Plaintiff was decommissioned, the OPA investigated another allegation that Plaintiff was engaged in a prohibited secondary employment job. On June 1, 2005, the OPA brought up Plaintiff on disciplinary charges concerning his application for secondary employment with a private security firm that Plaintiff actually owned, Cogent Investigative Services ("CIS").[6] (Scales Aff. ¶ 50.)

Police officers are permitted, within Department policy, to work secondary jobs. Decommissioned officers are not prohibited from doing off-duty work outside of the Police Department. Plaintiff did not work any extra jobs in 2003, nor did he work any extra jobs prior to his decommission on July 28, 2004.

On July 30, 2004, three days after his decommissioning, Plaintiff submitted a private investigator application to the State Department of Commerce and Insurance and formed Cogent Investigative Services. In November 2004, during his decommission, Plaintiff submitted a Police Department secondary employment form in order to work for Cogent Investigative Services. Plaintiff did not identify the name of his company as "Cogent Investigative Services" on the form; rather, he used the acronym "CIS" and did

---

[6]At the time of summary judgment briefing, it was undisputed that Plaintiff would not be subject to any disciplinary action, if at all, until after a disciplinary hearing or until he chose to settle the matter. As previously stated, Plaintiff's employment was terminated in May. The record does not disclose what additional events transpired prior to the termination.

14

not tell his supervisors what CIS stood for or that it was a private investigation company he owned. Plaintiff testified he used "CIS" because of the small space provided on the form, and his supervisors did not ask him what CIS stood for. Plaintiff testified that, after he sent in the completed form, his supervisor asked him, "what will be your duties in this?" The supervisor did not ask "what does CIS mean" or "what kind of profession are you in." (Docket Entry No. 24, Scales Depo. at 98.) "He just said, what are your job responsibilities, and I told him that I would be doing computer work and research and document work, which pretty much encompasses everything that I do with regard to this company." The supervisor did not ask what kind of computer work and research Plaintiff would be doing. Plaintiff did not tell him because he did not think about it at the time. (Id. at 99.) In February 2005 Plaintiff identified himself to the Department as the owner and chief investigator for Cogent Investigative Services.

Plaintiff now attests that he submitted the secondary employment form and obtained his private investigator license in the event Defendant fired him based on the allegations it was bringing against him. (Scales Aff. ¶ 50.) He states he had no intention of doing private investigator work because he knew it was against departmental policy. As a result of the application, he was required to submit to an investigation and voice analysis test administered by OPA. (Id.) Plaintiff was terminated because of his submission of the secondary employment form. (Id. ¶ 51.)

15

Plaintiff states he is familiar with the circumstances of the decommissioning of another Metro police officer. On or about December 8, 2004, Officer Ernest Cecil, who worked in the "gang section" of the Department, was decommissioned for allegedly violating departmental policy by being in a business that serves alcohol while in possession of his police-issued weapon. Within approximately two hours of the incident, the officer was decommissioned by Captain Ben Dicke, with the approval of Deputy Chief Anderson. The matter was referred to the District Attorney's Office for some type of criminal investigation, and the officer is still on decommission status. (Id. ¶ 52.)

Defendant responds that Officer Cecil was decommissioned promptly on December 9, 2004, after he refused to leave the nightclub where he was consuming alcohol to the point of intoxication while armed and after having driven there in a Metro police vehicle. (Docket Entry No. 26, Serpas Aff.)

## II. STANDARD OF REVIEW

In ruling on a motion for summary judgment, this Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of satisfying the court that the standards of

16

Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4

(6th Cir. 1986).  The ultimate question to be addressed is whether

there exists any genuine issue of material fact that is disputed.

See Anderson, 477 U.S. at 248.  If so, summary judgment dismissal

is inappropriate.

To defeat a properly supported motion for summary judgment, an

adverse party "must set forth specific facts showing that there is

a genuine issue for trial.  If the adverse party does not so

respond, summary judgment, if appropriate, shall be entered against

the adverse party."  Fed. R. Civ. P. 56(e).  The nonmoving party's

burden of providing specific facts demonstrating that there remains

a genuine issue for trial is triggered once the moving party

"show[s] – that is, point[s] out to the district court – that there

is an absence of evidence to support the nonmoving party's case."

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

### III.  ANALYSIS

**A.  Retaliation**

To establish a prima facie case of retaliation, Plaintiff must

show that: (1) he engaged in protected Title VII activity; (2) the

employer knew about Plaintiff's exercise of civil rights; (3)

thereafter, the employer took action against Plaintiff that would

have been materially adverse to a reasonable employee; and (4)

there was a causal connection between the protected activity and

the employer's action.  Burlington Northern & Sante Fe Railway Co.

v. White, — U.S. —, 2006 WL 1698953 at *3 (June 22, 2006); Allen v.

Michigan Dept. of Corrections, 165 F.3d 405, 412 (6th Cir. 1999).

17

The burden to establish a prima facie case in a retaliation action is not onerous. See EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997).

Once Plaintiff establishes a prima facie case, a rebuttable presumption of retaliation arises. See id. The burden of proof then shifts to the Metropolitan Government to articulate a legitimate, non-retaliatory reason for the adverse action. See White, 2006 WL 1698953 at *3; Brown v. Crowley, 312 F.3d 782, 805 (6th Cir. 2002). Once that reason is identified, the burden shifts back to the Plaintiff to prove that Metro's articulated non-retaliatory reason for its action was merely a pretext for unlawful retaliation. Id. To show pretext, Plaintiff must prove Metro's asserted reason had no basis in fact, the reason did not in fact motivate the adverse action, or the reason was insufficient to motivate the adverse action. Id.

For purposes of summary judgment, Defendant does not dispute that Plaintiff engaged in protected Title VII activity and that Defendant knew Plaintiff had exercised his protected rights. Instead, Defendant challenges Plaintiff's proof on the third and fourth elements as to whether Plaintiff was subjected to action that would have been materially adverse to a reasonable employee and whether there was a casual connection between the protected activity and any adverse action.

A job reassignment without a reduction in salary or work hour changes ordinarily does not constitute adverse action. See Kocsis v. Multi-Care Mgt., Inc., 97 F.3d 876, 886 (6th Cir. 1996). In this

18

The burden to establish a prima facie case in a retaliation action is not onerous. See EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997).

Once Plaintiff establishes a prima facie case, a rebuttable presumption of retaliation arises. See id. The burden of proof then shifts to the Metropolitan Government to articulate a legitimate, non-retaliatory reason for the adverse action. See White, 2006 WL 1698953 at *3; Brown v. Crowley, 312 F.3d 782, 805 (6th Cir. 2002). Once that reason is identified, the burden shifts back to the Plaintiff to prove that Metro's articulated non-retaliatory reason for its action was merely a pretext for unlawful retaliation. Id. To show pretext, Plaintiff must prove Metro's asserted reason had no basis in fact, the reason did not in fact motivate the adverse action, or the reason was insufficient to motivate the adverse action. Id.

For purposes of summary judgment, Defendant does not dispute that Plaintiff engaged in protected Title VII activity and that Defendant knew Plaintiff had exercised his protected rights. Instead, Defendant challenges Plaintiff's proof on the third and fourth elements as to whether Plaintiff was subjected to action that would have been materially adverse to a reasonable employee and whether there was a casual connection between the protected activity and any adverse action.

A job reassignment without a reduction in salary or work hour changes ordinarily does not constitute adverse action. See Kocsis v. Multi-Care Mgt., Inc., 97 F.3d 876, 886 (6th Cir. 1996). In this

18

case, Plaintiff retained his Police Officer II title with salary and benefits. Decommissioning resulted, however, in a materially adverse change in the terms and conditions of employment of a reasonable employee because it involved significant diminishment of police functions with a reassignment to an administrative desk job, a change in shift from nighttime to daytime hours, and a loss of shift differential pay. See White, 2006 WL 1698953 at *3. Plaintiff also lost the prestige that accompanied his status as a police officer, cf. Kocsis, 97 F.3d at 886-887, and he was precluded from working secondary security jobs to earn extra income.[7] Accordingly, the Court concludes that Plaintiff has presented sufficient evidence to generate a genuine issue of material fact for trial on the third element of his retaliation claims.

To establish the causal connection required by the fourth element, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in protected activity. See Avery Dennison Corp., 104 F.3d at 861; Jackson v. RKO Bottlers, 743 F.2d 370, 377 (6th Cir. 1984). Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.

_____

[7] Plaintiff's ultimate termination from employment in May 2006 would certainly constitute an adverse employment action. See id. at 886.

19

See Moon v. Transport Drivers, Inc., 836 F.2d 226, 230 (6th Cir. 1987).

Here, Plaintiff has produced direct evidence, which the Court must take as true for purposes of summary judgment, that Lt. Tindall retaliated against Plaintiff because of the prior lawsuit against Metro. Plaintiff identified numerous comments and actions purportedly made and undertaken by Lt. Tindall showing a direct correlation with the prior suit. Additionally, there is a close temporal proximity between Plaintiff's letters to superiors and his decommissioning as a police officer sufficient to raise an inference that Plaintiff's protected activity was the likely reason for the adverse action. See Wade v. Knoxville Util. Bd., 259 F.3d 452, 463 (6th Cir. 2001); Morris v. Oldham Co. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000); Avery Dennison Corp., 104 F.3d at 861.

It will be for the jury to decide whether Metro has identified a legitimate non-retaliatory reason for Plaintiff's decommissioning and whether Plaintiff can prove that Metro's reason was a mere pretext for retaliation. All of the retaliatory conduct alleged, taken in a light most favorable to Plaintiff, creates a genuine issue of material fact as to whether a "casual connection" exists between Plaintiff's protected activity and his decommissioning. See Nguyen v. City of Cleveland, 229 F.3d 559, 566-67 (6th Cir. 2000).

## B. Breach of contract

Plaintiff does not respond to Defendant's argument that Plaintiff failed to establish a constitutional property right in his employment under 42 U.S.C. § 1983. See Ramsey v. Board of Educ., 844 F.2d 1268, 1271 (6th Cir. 1988). Thus, it appears Plaintiff has abandoned any § 1983 claim. Defendant's summary judgment motion will be granted to that extent.

Plaintiff asserts that he produced sufficient evidence to proceed to the jury on a breach of contract claim in that Defendant did not abide by the Settlement Agreement term not to retaliate against the Plaintiff.

To succeed on a breach of contract claim, Plaintiff must show (1) the existence of a contract; (2) a breach of the contract; and (3) damages from the breach. Life Care Ctrs. of Am., Inc. v. Charles Town Assoc. Ltd. Partnership, LPIMC, Inc. 79 F.3d 496, 514 (6th Cir. 1996). A settlement agreement, which is a contract between the parties, can be the basis for subsequent liability if one party breaches the terms and conditions of the agreement. Bamerilease Capital Corp. v. Nearburg, 958 F.2d 150, 152 (6th Cir. 1992).

The Court concludes that Plaintiff has presented ample evidence to create a genuine issue of material fact for trial on the question of whether Metro breached the settlement agreement. Therefore, the breach of contract claim will proceed to the jury.

21

## IV. CONCLUSION

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 10) will be granted only to the extent Plaintiff abandoned his § 1983 claim and otherwise, the Motion will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE